HAROLD KLINGMAN v. LOEW'S INCORPORATED.[1]

February 28, 1941.

No. 32,623.

[1]Reported in 296 N. W. 528.

*William H. DeParcq,* for appellant.

*Freeman & King, Kingman, Cross, Morley, Cant & Taylor,* and *A. Lyman Beardsley,* for respondent.

JULIUS J. OLSON, JUSTICE.

In an action to recover damages for personal injuries suffered in an automobile accident defendant had a verdict, and plaintiff appealed from an order denying his motion for new trial.

The jury could well find the following facts: Plaintiff, who is a film salesman for Republic Pictures Corporation, has a territory including northern Minnesota and all of North Dakota. Walter McKean, similarly employed by defendant, had a territory including North Dakota and certain portions of Minnesota. Each owned and drove his own car, but used it in the business of his employer and for his personal use and pleasure as well. The men were on friendly terms and had associated for a considerable period of time.

The day before the accident, October 3, 1938, each learned that the other had business to transact at Onamia. So they arranged to start early the next morning in order that they might enjoy a duck hunt after their business there had been attended to. Each drove his own automobile to Stein's Resort on the shore of Mille Lacs Lake. There McKean left his car, plaintiff's being used on the hunting trip. They returned to Stein's about 4:30 o'clock. Each partook of a sandwich and a bottle of beer. The rest of the afternoon was spent in cleaning up, changing clothes, and visiting in a friendly way. Their plan was to have a duck dinner at Deike's Hotel, some two or three blocks north of Stein's. About 8:15 p. m. they started for Deike's Hotel. Upon arriving there they learned that the cook was off duty, so they spent the best part of the next two hours visiting and singing. Both plaintiff and McKean were "very good" singers. The testimony does not indicate what their repertoire included. There is nothing to indicate that they sang "Sweet Adeline" or "Good Night Ladies," so plaintiff's contention that they were strictly sober may be, by inference at least, assumed. At any rate, shortly before ten o'clock they concluded to go to Garrison for dinner. McKean's car, a new Buick in perfect condition, was used, and it was on this trip that the fatal accident occurred. Plaintiff sat to the right in the front

seat, McKean as driver to the left, and between them sat Dorothy Stein, a friend of plaintiff's. The night was dark. The road is "very curving" between Deike's Hotel and Garrison, especially the southerly two miles thereof. Although it is a tarvia state highway, it is dangerous for fast travel because of its sharp curves, especially at night, if one is not well acquainted with it. Plaintiff was thoroughly familiar with the road, having driven over it frequently, every month or so, for a period of years. McKean was not, since it was not within his usual or designated territory. Plaintiff lucidly describes the stretch of road here involved:

"Here is the way the road is, it is so twisting and turning, on this stretch you can go 60, then slow down to 30 to make a curve, go up to 45, and slow down to 40 to make a curve. That is the type of road it is."

He further testified that he did not know whether he could make the curve near which the accident happened at 50 to 60 miles, not having tried it, but said, "I believe I could make it."

There is a town hall located on the west side of the highway near and to the north of this curve. In front of it there was a stone or concrete abutment with steps extending to within two or three feet of the traveled portion of the highway. In making this curve, McKean drove across the center of the highway in such fashion that his car left the highway proper, went over onto the west (left) side, and traveled on the wrong side and partly on the shoulder some 200 or 300 feet at a speed testified to by plaintiff of between 50 and 60 miles per hour. This portion of his testimony is important:

Q. "What kind of highway is 169 along there?

A. "Very curving. * * *

Q. "When he crossed the center line and failed to keep on his own, right-hand side of the highway, going around the curve, did he operate it about the same that he had been operating [it] from the time he left Deike's Hotel?

A. "As far as I can remember, yes. I remember a sort of hollering or noise of the wheels that rubber will make on a curve when you are taking it and kind of go sidewise, and I knew the car was out of control, but I didn't see the steps until we were right up on them."

The stone steps or abutment were struck with such force that chunks of concrete were thrown as far as 100 feet beyond where the car came to a stop. Needless to say, the automobile was wrecked—it moved forward only about 15 feet after the impact. McKean was killed and plaintiff was injured. To recover damages for plaintiff's injuries, the present action was brought.

To fasten liability upon defendant, plaintiff sought to show that this was a business trip, the assertion being that someone at Ironton had informed plaintiff that there was an opening in North Dakota of interest to McKean's employer, and that McKean was going there with plaintiff in furtherance of his employer's business. We shall go no further into that situation than to remark that this was one of the issues submitted to the jury and answered by the verdict for defendant.

Plaintiff relies for reversal here upon three points, *viz.*, That the court erred (1) in not submitting to the jury the *res ipsa loquitur* rule; (2) in submitting the question of plaintiff's contributory negligence; and (3) in permitting defendant to cross-examine and impeach two of its own witnesses. Consideration of each of these is deemed necessary since the verdict, which is a general one, may have for its basis either that defendant was not liable because the accident occurred on an errand personal to McKean and not at all connected with or in furtherance of his employer's business; or, that any or all of the grounds here complained of are erroneous. The questions will be considered in the order mentioned.

The *res ipsa* doctrine has for its background common-carrier liability, such as that between a passenger who is injured and a transportation company. It has come about because of the complete control exercised by a carrier over its equipment and ap-

pliances. For example, where a passenger was injured in the course of his journey, the courts agreed that it was the duty of the carrier to explain why it was not at fault. And in this class of cases one finds this doctrine most frequently applied. In some cases the maxim applies only where that relationship exists, or where there is a contractual relation between the parties to the transaction producing the injury. Like many other doctrines, this one was extended from time to time to include innkeepers; also gas companies upon a showing of a leak of gas or the occurrence of an explosion. 20 R. C. L. p. 188, § 157, and cases under notes. It frequently has been applied to utility companies such as those furnishing electric light and power. Goar v. Village of Stephen, 157 Minn. 228, 233, 234, 196 N. W. 171. So it is that the doctrine as now applied in effect "asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care." 20 R. C. L. p. 185, § 156, and cases under note 4. And this in substance is the rule in this state. 4 Dunnell, Minn. Dig. (2 ed. & Supps.) § 7044, and cases cited under notes.

■ But, as we have said (Heffter v. Northern States Power Co. 173 Minn. 215, 217, 218, 217 N. W. 102, 103):

"It is not the accident but the circumstances that justify the application of the doctrine. * * * The inference which the doctrine permits is grounded upon the fact that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to defendant but inaccessible to the injured person. * * * It may happen that a plaintiff makes a prima facie case by showing the accident with its attendant circumstances and yet he may destroy by his own evidence the application of the doctrine. * * * Necessity seems the best support for the rule although some author-

ities base it on the doctrine of probabilities. We recognize the rule as resting on inference and not presumption."

■ The question therefore is whether the facts appearing in the evidence are such as to "destroy the application of the doctrine." Since the recited facts clearly establish "a prima facie case by direct evidence of the facts constituting the negligence which caused his [plaintiff's] damage [therefore] he cannot invoke the rule of res ipsa loquitur. * * * In the absence of its necessity the rule falls." In such circumstances, the case goes to the jury "unhampered by the rule," and plaintiff's recovery "must be predicated upon a finding of facts constituting the negligence." Heffter v. Northern States Power Co. 173 Minn. 215, 219, 217 N. W. 102, 104; 20 R. C. L. pp. 185, 188, § 156, and cases under note 11. "The circumstances must exclude any reasonable probability that the fault of the one seeking to invoke it contributed to the result of which he complains." 4 Dunnell, Minn. Dig. (2 ed.) § 7044, p. 1121.

There is no question about the rule and its use in appropriate situations. But here, as often happens, while plaintiff is "proving the particulars of the accident, its cause is revealed, and thereby competent and sufficient proof of negligence [is] furnished." *Id.* p. 1119.

This conclusion seems inescapable since those surviving the accident and the only eyewitnesses to what occurred prior to and at the time of the accident are plaintiff and the young lady riding with them. And, as we have seen, from them came the testimony as to the condition of the road; that it was one of tarvia construction and as such would absorb much of the light rays from the car; that they sat in the front seat with the driver and as such could and did see as well as he what was to be seen; that plaintiff was acquainted with the road and its many and dangerous curves; that this accident happened long after dark—at night; that he knew of the speed at which the car was being driven, 50 to 60 miles at the point where the car swerved to the west and into the wrong traffic lane—in fact, that he knew every movement

of the car during the progress of the trip until the accident occurred. In view of all these facts, we think there is nothing left to the inference which the doctrine is supposed to furnish.

■ The facts related establish that plaintiff's contributory negligence was in the case. All else aside, his testimony proves the propriety of its submission. Johnson v. Evans, 141 Minn. 356, 360, 361, 170 N. W. 220; Farnham v. Pepper, 193 Minn. 222, 226, 227, 258 N. W. 293; Holmes v. Lilygren Motor Co. Inc. 201 Minn. 44, 47, 275 N. W. 416.

■ The last assignment relates to the claimed error of permitting defendant to cross-examine two of its own witnesses, Albert and Frieda Deike. Each was friendly to plaintiff, and prior to the trial each had given to one Geer written statements in respect to certain facts deemed of value to defendant. These were in counsel's possession at the trial. Naturally, what he expected and had a right to expect was testimony in harmony with the facts therein set forth. Counsel sought to show that the accident occurred on this trip while McKean was wholly outside the scope of his employment; that this .trip was a personal affair and not at all connected with his designated work or his employer's business affairs. The statements so given tended to support that theory in that plaintiff and McKean had planned to go duck hunting the next day and this was overheard by the witnesses. During the course of the examination defendant's counsel asked Mr. Deike: "What did you hear them say about hunting the following morning?" The witness answered: "My recollection isn't clear enough to give anything definite on that." Counsel expressed surprise and asked for the privilege of impeaching his testimony on that point. To this plaintiff's counsel objected on the ground that there was no foundation shown for such procedure. The court said: "I think when counsel claims surprise, I will permit him to cross-examine his own witness." Thereupon counsel, without further objection, proceeded to question him in respect to the contents of what he theretofore had signed as a statement of the facts. The examination was conducted in orderly fashion. Plain-

tiff's counsel in like manner then subjected the witness to cross-examination with such skill as to keep the statements from being received in evidence. The situation as to Frieda Deike is substantially the same except that as to her there was no such objection made to defendant's right to cross-examine her. The court instructed the jury that *"statements* so made prior to the time of the trial by these witnesses *are not substantive evidence and are not evidence of any of the facts at issue in this case. A contradictory statement made out of court is admitted and can be considered only insofar as it impairs the credibility of the witness who made the statement and not otherwise."* (Italics supplied.) We cannot assume that the jury failed to heed this direction.

■ The purpose of testimony in any case is to ascertain the facts. Truthful testimony may come from a bad source and untruthful testimony may come from a source considered good. No arbitrary rule can be laid down applicable to all situations. In all cases where there is a fact issue for the jury, the truthfulness of the testimony of the particular witness is to be determined upon his whole evidence as brought out both on direct and cross-examination.

■ With the trial court is left a large measure of discretion in respect to the admission and exclusion of evidence. That is conceded in the cases upon which plaintiff relies. In State v. Saporen, 205 Minn. 358, 361, 285 N. W. 898, reversal was ordered because this court deemed the testimony thereby elicited "not enough to qualify the previous contradictory assertion as *substantive evidence."* (Italics supplied.) In State v. Lemke, 207 Minn. 35, 41, 290 N. W. 307, 310, the rule laid down in the prior case was adhered to, but we said that "even if the cross-examination was improper," it was not upon the facts there disclosed of sufficient importance to require a reversal. In that case a man's liberty was at stake. There the possibility of harm was much more likely than here. In this situation, we cannot say that there was an abuse of discretion resulting in harmful error to plaintiff.

Order affirmed.